UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARILYN OZOLS,<br>     Plaintiff,<br><br>     v.<br><br>TOWN OF MADISON, et al.,<br>     Defendants. | No. 3:11cv1324 (SRU) |

**RULING ON MOTION TO DISMISS**

On February 10, 2012, I held a hearing on the defendants' motion to dismiss. At the conclusion of the hearing, I orally granted in part and denied in part the motion. During my ruling, I noted that the Connecticut Supreme Court had yet to decide whether the United States Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), applied to Connecticut's constitutional free speech provisions. At that time, the Connecticut Supreme Court had heard oral arguments in a case that was expected to decide the issue.

Since then, the Connecticut Supreme Court issued its decision in *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483 (2012). The Court held that the plaintiff had failed to preserve for appeal the argument that *Garcetti* did not apply to the state constitutional provisions. The question thus remains an open one. As a result, I have elected to issue a written decision setting out the reasons for my oral ruling on the motion to dismiss the section 31-51q retaliation claims.[1]

---

[1] I have omitted any discussion of my ruling on the motion to dismiss the section 31-51m whistleblower claim, the claim for intentional infliction of emotional distress, and the claim for negligent infliction of emotional distress.

I also omit the discussion, conducted at oral argument, of whether the speech at issue was a matter of public concern.

- 1 -

I.   **Background**[2]

This case involves a public employee who was fired after tangling with her employers about zoning decisions and the formation of a union. At all relevant times, the plaintiff, Marilyn Ozols, was the Planning and Zoning Administrator for the defendant, the Town of Madison. Ozols took direction from the Town of Madison Planning and Zoning Commission ("the Commission"). In 2010, Ozols reported to defendant Fillmore McPherson, Madison's First Selectman.

In February 2010, the Madison Town Engineer, defendant Michael Ott, submitted a zoning application on Madison's behalf regarding a town garage. Ozols informed Ott that the application was incomplete. In response, McPherson issued Ozols a verbal warning.

In April 2010, Ott submitted a zoning application on Madison's behalf regarding a special exception permit. The Commission Chair, Christine Poutout, advised Ozols that Ott needed to complete a revised plan to reflect improvements on the site of the zoning application. McPherson then chastised Ozols for telling Ott he needed to include an "as built site plan." In or around December 2010, Ott became Ozol's supervisor.

In January 2011, the UPSEU union filed a petition to represent Madison employees for collective bargaining purposes. Ozols vocally supported the union. After Ozols expressed her support, Ott and McPherson became more hostile toward her.

In February 2011, Ott directed Ozols to change zoning policies with respect to zoning applications affecting inland water areas. Ozols believed the changes Ott wished her to make were in violation of Connecticut law. As a result, on February 7, 2011, Ozols wrote to the inland wetlands officer and voiced her concerns. On February 9, 2011, Ott and McPherson met with

---

[2] All facts are drawn from the plaintiff's complaint.

Ozols and admonished her for speaking out.  They also advised her not to speak out in the future, and not to inform the Commission of any changes in land use policies.  Following that meeting, Ozols contacted Poutout and told her about Ozols' conversations with McPherson and Ott.

During this time, Ozols was "continually and falsely accused of having performance deficiencies and not taking direction from" Ott.  Ozols was also "forced to attend performance meetings which were used as a venue to unfairly and in an abusive manner admonish and criticize" her.

On April 1, 2011, Ozols attended a meeting with Ott and Madison's Interim Human Resources Manager, Edward Dowling.  Ozols requested that Poutout attend the meeting, but her request was denied.  At the meeting, Ott chastised Ozols for various performance deficiencies.  Ott told Ozols that any future attempts to involve the Commission in meetings would subject her to further discipline.

On April 4, 2011, Ott issued a written warning to Ozols.  Ott criticized Ozols for voicing concerns about the zoning applications affecting inland wetland areas, and for consulting with the Commission about a zoning application Ott had submitted on behalf of Madison.

On April 20, 2011, Ott sent Ozols another written warning, and gave her a three-day suspension.  Afterwards, Ozols told Poutout she was concerned that she was being disciplined in order to pressure her to ignore zoning regulations.  Ozols also told Poutout that she did not believe Ott had the authority to discipline her.

On May 23, 2011, Ozols was forced to attend an executive session meeting before the Board of Selectmen.  At that time, Ott again criticized Ozols.  During the meeting, Ozols expressed concern that she was being subjected to retaliation and workplace bullying.  On June

2, 2011, Ott suspended Ozols from her employment, and recommended to the Board of Selectmen that Ozols be fired.

On June 8, 2011, Ozols sent letters to the Commission and Board of Selectmen, stating that "she had been subjected to retaliation, bullying and harassment for supporting union activities, following the zoning regulations and statutes and the directives of the Commission, and voicing her concerns to the Commission." On June 9, 2011, a meeting was held before the Board of Selectmen, during which Ott argued for Ozols' termination. The Board of Selectmen eventually voted to fire Ozols. McPherson, the chair of the Board of Selectmen, participated in the termination decision.

## II.    Standards of Review

The defendants have brought motions to dismiss under Rule 12(b)(6) for failure to state a claim, and under Rule 12(b)(1) for lack of subject matter jurisdiction.

### A.    Failure to State a Claim

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

B. Lack of Subject Matter Jurisdiction

The party who seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

**III.   Discussion**

Section 31-51q of the Connecticut General Statutes is a cause of action for violation of the right to free speech under both the U.S. and Connecticut Constitutions. It reads, in relevant part,

> Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of the article first of the Constitution of the states,[3] provided such activity does not

---

[3] Article 1, section 3 of the Connecticut Constitution states: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to

- 5 -

> substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages . . . .

To succeed on a claim under section 31-51q, Ozols must demonstrate that,

> (1) [S]he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) [s]he was fired on account of [her] exercise of such rights; and (3) [her] exercise of [her] First Amendment rights did not substantially or materially interfere with [her] bona fide job performance or with [her] working relationship with [her] employer.

*Trusz v. UBS Realty Investors*, Civ. No. 3:09cv268 (JBA), 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010) (internal citation omitted).

The defendants argue that the first prong has not been met here. According to the defendants, all of Ozols' pertinent speech was made as a public employee, not a citizen, and thus under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), her speech was not protected. Ozols argues that *Garcetti* does not apply to section 31-51q claims.

*Garcetti* arose after a deputy district attorney, Richard Ceballos, discovered that there were serious factual inaccuracies in a deputy sheriff's affidavit that had been used to obtain a search warrant. *Id.* at 413-14. Ceballos informed his supervisors of the situation, and recommended that the criminal case arising from the search warrant be dismissed. *Id.* at 414. Ceballos's supervisors rejected his recommendation, and at trial Ceballos testified for the

---

excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."

Article 1, section 4 states: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article 1, section 14 states: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

defense about the affidavit's inaccuracies. *Id.* at 414-15. Afterward, Ceballos was subject to retaliatory employment actions. *Id.* at 415. As a result, he brought suit.

In *Garcetti*, the Supreme Court held that in order to be entitled to First Amendment protections, a public employee must be speaking as a citizen, not as an employee. The Court noted that government employers "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provisions of public services." *Id.* at 418. Moreover, public employees "often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419. The Court also sought to ensure that its First Amendment jurisprudence not empower employees "to constitutionalize the employee grievance." *Id.* at 420. Nevertheless, the Court determined that government employees still enjoy First Amendment protections when they are speaking as citizens, because the government cannot restrict "the liberties employees enjoy in their capacities as private citizens." *Id.* at 419.

The parties appear to believe that *Garcetti* should apply to the entirety of section 31-51q, or none of it. I believe it makes more sense analytically to split section 31-51q into the federal constitutional claims and the state constitutional claims, and determine whether *Garcetti* applies to each provision. The Connecticut Supreme Court signaled in *Perez-Dickson* that it would also analyze each type of claim separately. In that case, the Court confirmed that *Garcetti* applies to section 31-51q claims that are based on violations of the First Amendment. 2012 WL 1393886, at *5. The Court declined to decide whether *Garcetti* applies to section 31-51q claims that are based on the state constitution.

I believe that, were the Connecticut Supreme Court to answer the above question, it

would hold that *Garcetti* does not apply to claims based on the state constitution. The Connecticut Supreme Court has repeatedly held that Connecticut's protection of free speech is broader than the federal government's. *See, e.g., State v. Linares*, 232 Conn. 345 (1995). In *Linares*, the Court ruled that the state constitution's free speech provision had a greater scope than the federal constitution in part because of its broader language: the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," while the Connecticut Constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty," and that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." Conn. Const., Art. 1, §§ 4, 5. The Court found it instructive that article 1, section 4 allows citizens to speak freely on "all subjects," while the federal constitution's language is more limited.[4] The breadth of the Connecticut Constitution's language suggests that a citizen's speech is protected, even when the speech is about her employment.

---

[4] Some courts in the District of Connecticut have stated that "the application of Conn. Gen. Stat. section 31-51q is coextensive with the First Amendment, and therefore, the two provisions are to be interpreted identically." *See, e.g., Nyenhuis v. Metro. Dist. Comm'n*, No. 3:08cv069 (AWT), 2011 WL 2618965, at *4 (D. Conn. July 1, 2011); *Baldyga v. City of New Britain*, 554 F. Supp. 2d 268, 278 (D. Conn. 2008); *Sturm v. Rocky Hill Bd. of Educ.*, No. 3:03vc666 (AWT), 2005 WL 733778, at *2 (D. Conn. Mar. 29, 2005). The genesis of that view comes from *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766 (1999), in which the Supreme Court applied the "matter of public concern" requirement, originally created in the federal context, to all claims under section 31-51q. Although the Court in that case seemingly lumped together the United States and Connecticut Constitutions in its analysis, the Court specifically noted that "Daley makes no claim that article first, § 4, of the Connecticut constitution is any broader than the first amendment to the United States constitution. Accordingly, our inquiry <u>is limited to that speech which is protected under the federal constitution</u>." *Id.* at 778 n.6 (emphasis added). Because *Daley* was dependent on the waiver of the plaintiff's argument, it remains unclear whether the Connecticut Supreme Court would treat section 31-51q as coextensive with the First Amendment.

I also believe the Connecticut Supreme Court may wish to curtail the reach of *Garcetti* because it has been often criticized. As Justice Souter has noted, there is something strangely arbitrary about a judicial inquiry into when a citizen is acting as a citizen.

> [T]he very idea of categorically separating the citizen's interest from the employee's interest ignores the fact that the ranks of public service include those who share the poet's "object . . . to unite [m]y avocation and my vocation"; these citizen servants are the ones whose civic interest rises highest when they speak pursuant to their duties, and these are exactly the ones government employers most want to attract.

*Garcetti*, 547 U.S. at 432 (Souter, J., dissenting) (internal citations omitted). Further, it is questionably sound to deny public employees the right to speak about matters of great public concern. "'Government employees are often in the best position to know what ails the agencies for which they work.'" *Id.* at 429 (Souter, J., dissenting) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)). By diminishing the protections available to employee-speakers, *Garcetti* makes employees "less secure in their ability to speak out against governmental fraud, corruption, abuse, and waste without facing retribution from their public employers." Paul M. Secunda, Garcetti's *Impact on the First Amendment Speech Rights of Federal Employees*, 7 First. Amend. L. Rev. 117, 118 (2008).

The majority in *Garcetti* brushed away concerns about protecting employee whistleblowers by noting that other statutes would protect those employees from retaliation. But as the *Garcetti* dissent predicted, *id.* at 439-40, such speech often falls outside the narrow confines of whistleblower statutes. *See* Ruben J. Garcia, *Against Legislation:* Garcetti v. Ceballos *and the Paradox of Statutory Protection for Public Employees*, 7 First. Amend. L. Rev. 22 (2008) (detailing failures of statutory protections for government whistleblowers).

Finally, the concerns espoused by the majority in *Garcetti* are also alleviated by the text of section 31-51q. The majority noted that employers "need a significant degree of control over

- 9 -

their employees' words and actions," and that when employees "speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418-19.  But section 31-51q only provides a cause of action when the employee's speech "does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." Conn. Gen. Stat. § 31-51q.[5]

In short, I do not believe that *Garcetti* applies to those portions of section 31-51q that relate to rights protected by the Connecticut Constitution.  As a result, the defendants' motion to dismiss the section 31-51q claims is **DENIED**.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of July 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

[5] As academics have noted, *Garcetti* and the citizen/employee dichotomy may even hinder the government's ability to be an effective manager, by encouraging potential plaintiffs to "complain outside of work so they can get the protection of being a 'citizen.'"  Secunda, *supra*, at 123-24. "Needless to say, this state of affairs leads to a tremendous waste of judicial resources on unnecessary litigation that might have been resolved internally." *Id.* at 127.